UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE MEDLIN,

                              Petitioner,

            – *against* –

JEFFREY A. TEDFORD, *Superintendent of Adirondack Correctional Facility*,

                              Respondent.

**OPINION & ORDER**

18-cv-5928 (ER)

RAMOS, D.J.:

    Petitioner George Medlin filed a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254 ("petition") on June 29, 2018.  Doc. 1.  Medlin challenged his state convictions on three counts of rape in the first degree and six counts of criminal sexual act in the first degree.  *See generally id.*  The Court referred the petition to Magistrate Judge Stewart D. Aaron on April 2, 2020.  Doc. 9.

    On January 18, 2022, Judge Aaron issued a Report and Recommendation ("Report" or "R&R") recommending that the Court deny Medlin's petition.  Doc. 42.  Medlin filed his written objections to the Report on February 10, 2022.  Doc. 46.  The Bronx County District Attorney's Office[1] filed a declaration in opposition on April 27, 2022.  Doc. 49.

    For the reasons stated herein, the Court adopts the Report in its entirety, and the Petition is DENIED.

## I.    BACKGROUND

    The factual and procedural background relevant to Medlin's petition are set forth in detail in Magistrate Judge Aaron's Report, as well as the memoranda submitted in support and opposition of the pending petition.  *See* Doc. 42; Doc. 7; Doc. 25.  The record

---

[1] The Bronx County District Attorney's Office represents respondent Jeffrey A. Tedford, the superintendent of Adirondack Correctional Facility, where Medlin is currently incarcerated, pursuant to an agreement with the Office of the Attorney General of the State of New York.  Doc. 49 ¶¶ 1–2.

relating to Medlin's petition is extensive; here, the Court restates the background that is necessary to resolve the arguments set out in Medlin's petition and objections to the Report.

### A.  Facts Underlying Medlin's Convictions & Trial Proceedings

On February 5, 2005, a New York jury convicted George Medlin of raping and sexually assaulting the six-year-old daughter of his former girlfriend on three occasions between November 2003 and February 2004.  *People v. Medlin*, 144 A.D.3d 426 (2016); *see also* Doc. 7 at 10–11.  During the trial, defense counsel's theory was that Medlin did not have the opportunity to commit the alleged crimes, but that other individuals may have.  Doc. 33-1 at 33 ("So, there was a very, very little window of opportunity for George to have committed any of the acts that the People allege that he committed.  On the contrary, there were others that went to that apartment . . . that had a much greater opportunity to commit any sort of acts against this little girl.").  Counsel also underscored that the victim child's testimony was undermined by common-sense conclusions that could be drawn from the evidence.[2]  Doc. 33-4 at 6.

The jury heard from a number of witnesses including the victim, Aisha, her mother, Cheryl,[3] Medlin, and several other individuals including two experts who testified for the prosecution.

### i.  Aisha's Testimony

Aisha was seven years old at the time of Medlin's trial.  Doc. 33-2 at 14.  Aisha testified that she knew Medlin, her "mother's boyfriend," and further noted that he had never lived with her.  *Id.* at 20.  However, she testified that Medlin lived across the street

---

[2] Specifically, counsel emphasized Medlin's size, including his height and weight, in relation to the then-six-year-old victim child, in the context of the documented injuries.  *See, e.g.*, Doc. 33-4 at 6–8.  He also underscored the child's failure to disclose the abuse or express fear of Medlin.  *See id.* at 6.

[3] As in the Report, the Court here refers to the victim and her mother by their first names only pursuant to New York Civil Rights Law § 50-b.  Doc. 42 at 2 n.3.

2

from her and her mother. *Id.* According to Aisha, Medlin "sometimes" spent the night.[4] *Id.* at 21.

Aisha then testified about the three occasions when Medlin sexually assaulted her. *Id.* at 21.

The first time,[5] Cheryl went to the store to buy chips and peanuts, and Aisha stayed at home because she wanted to watch TV. *Id.* at 22. Aisha was lying in bed watching TV when Medlin entered the room. *Id.* At that point, she tried to run to the living room. *Id.* 23. But as she was trying to leave the bedroom, Medlin "grabbed" her, threw her on the bed, pulled up her gown, and pulled down her underwear. *Id.* at 23–24. She was lying on her back. *Id.* at 23. Medlin then "got on top of [her] and put his private into [hers]."[6] *Id.* When asked how she felt when this occurred, Aisha stated that it hurt. *Id.* at 24. Aisha testified that Medlin thereafter opened her mouth with his hands, put his "private" in her mouth, and "moved it a little bit." *Id.* at 24–26. She said that "[i]t felt uncomfortable," *id.* at 25, and she specified that she told Medlin to stop, *id.* at 26. Aisha did not tell her mom about what happened when she returned from the store because she was scared. *Id.* at 27.

On the second occasion,[7] Cheryl left the apartment to go to the supermarket. *Id.* at 31. Aisha did not go because it was cold outside, and she stayed home with Medlin. *Id.* As Aisha was laying in her mother's bedroom watching TV, Medlin entered the room. *Id.* at 32–33. Aisha tried to run, but was unable to get away. *Id.* at 33–34. Medlin pulled her by her waist and threw her on the bed. *Id.* at 34. Thereafter, Medlin pulled down his

---

[4] Aisha testified that other than Medlin and her "Aunt Debbie," nobody else ever spent the night at her apartment. Doc. 33-2 at 21.

[5] The first incident occurred between Thanksgiving and Christmas in the late fall of 2003. Doc. 33-2 at 30–31.

[6] When asked about the word "private" during her testimony, Aisha gestured toward her groin and indicated that her "private" was not "the same" as Medlin's. Doc. 33-2 at 50–51. She also described Medlin's private parts. *Id.* at 52.

[7] The second incident occurred after Christmas 2003. Doc. 33-2 at 37.

pants, opened Aisha's mouth, inserted his penis, and "moved a little bit." *Id.* at 34–35. Aisha said that it hurt. *Id.* at 35. She added that Medlin "humped" her. *Id.* at 36.

On the third occasion,[8] Cheryl went to work, and Aisha stayed home sick. *Id.* at 40. When Cheryl left the apartment, Aisha was laying down in bed watching TV. *Id.* Aisha asked Medlin if he could make her some soup. *Id.* at 41. She ate it and then asked him for a second bowl. *Id.*

After she finished eating, Aisha returned to the bedroom, "and that's when [Medlin] came in and put his private in [hers]." *Id.* at 42. She said that Medlin grabbed her by her waist, put her on the bed on her back, "put his private into [her] [ . . . ] private," and moved. *Id.* at 42–43. This hurt Aisha and made her feel uncomfortable. *Id.* Thereafter, Medlin opened her mouth and inserted his penis. *Id.* at 43–44. He "moved a little bit." *Id.* at 44. Aisha then went to the bathroom because there was "white stuff" on her cheek and mouth. *Id.* at 44–45. Medlin proceeded to change the sheets, and Aisha went to the living room to wait for her mother. *Id.* at 45. However, she did not tell Cheryl what had happened because she was scared. *Id.* at 45–46. According to Aisha, Medlin told her not to tell her mother. *Id.* at 46.

Aisha testified that she told several people about these incidents. *Id.* at 48. She first told Sharae Daniels, the daughter of Aisha's babysitter, *id.* at 48–49, and her friend Liz, *id.* at 49. Thereafter, Aisha's mother was notified, and Aisha spoke with the police and with a doctor. *Id.* at 50.

During cross-examination, defense counsel, Robert Johnston, asked Aisha whether other men, besides Medlin, visited her apartment. *Id.* at 61. Aisha stated that no other "boyfriends" of her mother's visited the apartment, and she had never seen other strange men there. *Id.*

---

[8] The third incident took place between January 1, 2004, and February 7, 2004. Doc. 33-2 at 46–47.

4

Counsel also asked Aisha why she failed to tell her mother about the abuse. *Id.* at 66. Aisha responded that she was scared because Medlin had told her not to say anything. *Id.* When asked why she stayed with Medlin on the second occasion, after she experienced the first incident of abuse, Aisha stated that she stayed home because "it was cold and my mother said to stay home cause it was cold." *Id.* at 68. Similarly, when asked why she stayed with Medlin on the third occasion, after she experienced the prior two incidents of abuse, Aisha stated that nobody else was available to babysit her. *Id.* at 70–71.

### ii. Cheryl's Testimony

The prosecutor also called Cheryl to the witness stand. She stated that Medlin babysat Aisha on three occasions in late 2003 and early 2004.[9] *Id.* at 120–127, 137. She also testified about taking Aisha to the police department on February 14, 2004, and to the hospital on February 17, 2004. *Id.* at 127–128.

On cross-examination, defense counsel inquired about adult videotapes that Cheryl owned. *Id.* at 131–133. She admitted that she owned one video, and she noted that it was hidden in a drawer. *Id.* at 133. Counsel also elicited testimony regarding whether Cheryl had other male visitors over to her apartment. *Id.* at 134. Cheryl denied that she had ever had any. *Id.* at 134–135.

### iii. Medlin's Testimony

Medlin also testified. *See* Doc. 33-3 at 108. As relevant here, he indicated that on one occasion, Cheryl asked him for ten dollars in exchange for oral sex. *Id.* at 121. After "she had started," Medlin told her "[n]o, no . . . [b]ecause this wasn't right because the lady, she had a daughter . . . in the apartment." *Id.* at 122. Accordingly, he "gave her the money and [] left." *Id.* Medlin and Cheryl thereafter developed an ongoing sexual relationship. *Id.* at 122.

---

[9] Cheryl specifically stated that Medlin babysat Aisha in November 2003, December 2003, and January 2004. Doc. 33-2 at 120.

Medlin then testified about babysitting Aisha.  *Id.* at 123.  He stated that he babysat two times, "in the wintertime," around February 2004.  *Id.*  According to Medlin, on the first occasion, Aisha complained about being hungry and having a sore throat, so he made her some soup.  *Id.* at 124–125; *see also id.* at 126.  Medlin further stated that Aisha asked for a second bowl of soup, which she ate in the bedroom.  *Id.* at 125.  Cheryl came back within 30 minutes and said she was going to take Aisha to the doctor for her sore throat.  *Id.* at 125.

Medlin subsequently testified about the "second time."  *Id.* at 126.  He stated that Cheryl went to get something from the store,[10] but Aisha did not want to go.  *Id.*  When Medlin insisted that Cheryl take Aisha with her, Cheryl stated that it was cold outside, and Aisha "wound up staying there in house anyway."  *Id.*  Thereafter, Aisha sat at the edge of the bed watching TV until her mother got back.  *Id.* at 127.

According to Medlin, Aisha was "the type of little girl" that "spoke what was on her mind and she wasn't scared of nobody."  *Id.* at 129.  He further noted that Aisha "would push you back," if you pushed her, and that "she was nice . . .[,] but she wasn't no little girl."  *Id.*  He further noted that Aisha was jealous of his relationship with Cheryl, *id.*, and added that "[i]f I kissed Cheryl, I had to kiss Aisha too.  I said – I'm in the bedroom but everywhere that we move Aisha was right there," *id.* at 130.

When asked whether he ever touched Aisha improperly, Medlin stated that he had not, and he further emphasized that he "never disrespected a child in [his] life," or looked "that way at a child in [his] life[.]"  *Id.* at 125.  He also noted that Cheryl "had quite a few" male guests over at the apartment.  *Id.* at 127.  He added that on one occasion where he slept over at Cheryl's apartment, he woke up in the night and noticed "two guys in the living room," as Aisha slept on the couch.  *Id.* at 130.

---

[10] Medlin specifically testified that Cheryl "had to go get some kind of steam and peel or something for her head," and ultimately returned with "two bags of potato chips and a peel for her head," along with two beers.  Doc. 33-3 at 126–127.

On cross-examination, the prosecution elicited testimony about Medlin's work timesheets from December 2003. *Id.* at 145–147. Specifically, the prosecutor pointed out that the timesheet for the period of December 14, 2003, through December 27, 2003, which was written in Medlin's handwriting, contained false information. *Id.* at 145–147. Indeed, there were hours noted for multiple days during which Medlin did not, in fact, work. *Id.* at 147. Medlin admitted to falsely entering hours on his timesheets for days that he did not, in fact, work. *Id.* (noting that Medlin did not work on December 23, 24, or 25, but he nevertheless notated on his timesheet that he was at work from 8:00 to 4:000 on those days). These days were around the time that Aisha's abuse took place.

### iv. Expert Testimony

As relevant to Medlin's claims, the state also called two expert witnesses: Dr. Evelyn Shukat, an expert in the fields of Pediatric Medicine and Child Sexual Abuse, Doc. 33-3 at 1–36; and Dr. Don Lewittes, an expert in the field of Child Sexual Abuse Syndrome, Doc. 33-2 at 78–111.

At the time of her testimony, Dr. Shukat was the attending Pediatrician and Director of the Child Advocacy Center at Lincoln Hospital. Doc. 33-3 at 1. She had a New York State medical license and was board certified in pediatrics.[11] *Id.* at 4. Without objection, the court qualified Dr. Shukat as an expert in the field of Pediatric Medicine and Child Sexual Abuse. *Id.* at 6.

During the state's direct examination, Dr. Shukat provided opinions regarding child sexual abuse generally, and provided direct testimony of her examination of Aisha in February 2004. First, she testified that, based on her training and experience, there were usually no findings of "vaginal injury in situations where [a] child has stated that there has been a vaginal sexual assault." *Id.* at 7. She added that this was the case "[f]or

---

[11] At the time that Dr. Shukat testified in Medlin's case, she had previously testified between fifty and sixty times in several New York courts. Doc. 33-3 at 6.

a couple of reasons," *id.*, including delayed reporting, natural healing, and misperception by victims about the meaning of penetration, *id.* at 7–8.

Dr. Shukat then testified about her examination of Aisha.  *Id.* at 8.  She stated that she examined Aisha on February 17, 2004, and documented the examination in a hospital clinical chart.  *Id.*  Shukat referred to the record, which was admitted into evidence, and indicated that Aisha had been initially brought to the emergency room on February 14, 2004, due to "an alleged sexual molestation that occurred in November . . . ."  *Id.* at 11.

During the February 17 exam, Shukat followed "a standard routine," wherein she "g[ot] to know the child" before the examination.  *Id.*  Thereafter, Shukat conducted a head-to-toe examination.  *Id.* at 12, 13.  She conducted a gynecological examination using a colposcope,[12] which is "a magnifying device that is much like a microscope with a halogen light source that magnifies at ten times magnification."  *Id.* at 15.  Shukat observed that "there was a tear in the tissue around [Aisha's] hymen," which measured approximately two millimeters in length.[13]  *Id.* at 16.  The tissue was red, but there was no bleeding, and there were no abnormalities associated with Aisha's hymen.[14]  *Id.* at 16–17.  Dr. Shukat then tested for sexually transmitted diseases.  *Id.* at 17.

The state asked Dr. Shukat several questions about the possible origins of Aisha's injury.  Specifically, the prosecutor asked whether "such an injury [could] be caused by

---

[12] Dr. Shukat testified that the colposcope she used to examine Aisha did not have the ability to take photographs.  Doc. 33-3 at 15.

[13] Dr. Shukat underscored the internal nature of Aisha's injury, noting that it was not one that would have been noticed by a caretaker during the course of everyday activities because "[o]ne needed to retract the labia, spread the labia apart in order to see that tear."  Doc. 33-3 at 21.

[14] The Court admitted a diagram prepared by Dr. Shukat documenting her findings from the exam.  *Id.* at 17–18; *see also* Doc. 27-2 at 44.  The diagram depicted the female genital anatomy, and it indicated the location of the tear in the tissue adjacent to Aisha's hymen.  Doc. 33-3 at 20; Doc. 27-2 at 44.

Additionally, in the list of "physical findings," the chart noted the "Perihymenal tear," which was "irritated," approximately two millimeters long, and contained no active bleeding.  Doc. 33-3 at 20; Doc. 27-2 at 44.  It further indicated that "the area of the labia . . . was normal, and the hymen was noted to be crescent-shaped, no tears."  Doc. 33-3 at 20.  Finally, the physical findings noted that "the posterior fossette," which is "the area right beneath the hymen," was "normal as well" at the time of the examination.  *Id.*

an accidental fall or something like that." *Id.* at 22.  Shukat answered that "a straddle injury, such as falling on the bike bars, are usually external injuries." *Id.*  She then stated that the tear was not consistent with other causes, including masturbation, but was rather consistent with penetration in the vaginal area. *Id.* at 23.  Critically, Dr. Shukat concluded that the injury was consistent with the medical history that she had collected during her examination—namely, the abuse by Medlin reported by Aisha. *Id.*

On cross-examination, defense counsel elicited additional testimony about Aisha's examination.  Specifically, counsel asked Dr. Shukat whether she expected there to be a scar in circumstances where there had previously been a more significant injury, and whether Aisha presented with any scarring. *Id.* at 25–26.  Shukat noted that "injuries heal," and "depending on when one examines a child, you may not be able to see any preexisting injury if the healing process has taken place," but she admitted that she did not see any scars in her examination of Aisha. *Id.* at 25.  Defense counsel further inquired about Dr. Shukat's assumptions regarding the damage that would be caused by the sexual penetration of a man like Medlin. *Id.*  In response, Shukat noted that she did not "assume anything" and she did not know "what penetration occurred under what force[.]" *Id.* at 26.  When asked about the anatomical observations, Shukat reiterated that there was no injury to the hymen. *Id.* at 27.

Additionally, defense counsel asked Dr. Shukat about other circumstances that could have led to Aisha's injury. *Id.* at 27.  She noted that a fall "onto something hard" could have caused her injury "if it was penetrating within the lips of her vagina . . . but I got no history for that." *Id.* at 29.  Shukat went on to state that Aisha "exhibited the symptoms of giving a very detailed history of sexual abuse," *id.* at 31, adding that "Aisha described penetration and ejaculation and oral sodomy and explained that after she had penile-vaginal penetration, she had noticed blood on the vagina." *Id.* at 32.  When asked whether Aisha could have gotten the information "she needed" to produce those

statements from "an X rated or adult movie on a VCR in her apartment," Dr. Shukat answered that seeing pornography could explain some of the descriptions. *Id.* at 33.

On re-direct, Dr. Shukat made several points about sexual abuse generally, and specifically regarding Aisha. First, she noted that some children heal without scarring, *id.* at 34, and that there was no direct correlation between the size of a person who has committed a vaginal sexual assault on a child and the level of injury that may be sustained, *id.* at 35. She then stated that, based on her examination of Aisha and "[k]nowing that this [t]issue heals at a rate of about a millimeter a week," the injury was about a week and a half to two weeks old, thereby placing the injury around the end of January or early February 2004. *Id.* at 35–36.

The jury also heard from Dr. Don Lewittes, an expert in the field of Child Sexual Abuse Syndrome, Doc. 33-2 at 78–111. He began his testimony by outlining his educational history, indicating that he majored in psychology at New York University and went on to receive a P.H.D. in clinical psychology from the State University of New York in Albany. *Id.* at 79. The court qualified him as an expert in the field of Child Sexual Syndrome and Criminal Psychology without objection. *Id.* at 79–84.

As relevant here, Dr. Lewittes provided general testimony about Child Sexual Abuse Syndrome. *Id.* at 85. Specifically, he noted that the syndrome contained "five distinct phases," including engagement, sexual interaction, secrecy, disclosure, and suppression and repression. *Id.* at 85–90. In relevant part, Lewittes noted that "children don't often tell right away" when they've been sexually abused. *Id.* at 90. Additionally, he described the term "learned helplessness" and stated that depending on the age and development of a child, they "may make very minor efforts" to avoid abuse after realizing that their attempts to stop abuse are ineffective. *Id.* at 92–93. He added that "typically what you find in a relationship with a child who's frightened is you will not see

10

overtly necessarily any massive changes in their behavior because they accommodate to the situation." *Id.* at 94.

In regard to recollecting facts and details from instances of sexual abuse, Dr. Lewittes noted that "children are not very good on the peripheral or the border details of life." *Id.* at 96–97.  On the other hand, "[c]hildren tend to peg or have memories anchored to certain things," meaning that they are more easily able to provide "central action detail," including "who did what to whom." *Id.* at 97.

On cross-examination, defense counsel elicited testimony confirming that Dr. Lewittes had neither met Aisha nor otherwise analyzed her allegations.  *Id.* at 103.  Lewittes further affirmed that he had no opinion as to whether Aisha had been abused. *Id.*  Defense counsel also asked Dr. Lewittes how many, of the "thousand or so people" that Lewittes had previously treated, had made allegations later proven to be false.  *Id.*  Lewittes stated that it was hard to answer that question because in some instances, "there may not be enough information," however, "[t]hat doesn't mean it's proven or unproven." *Id.* at 104.

### *v.* **Summations, Deliberations, and Verdict**

During Medlin's summation, defense counsel questioned Aisha's credibility and reiterated the argument that Medlin did not have the opportunity to commit the alleged abuse.  In regard to Aisha's testimony, he pointed out that there were timing inconsistencies regarding the instances of sexual contact.  Doc. 33-4 at 4–5.  He also highlighted Cheryl's testimony about adult videos in the apartment, arguing that Aisha may have "fantasize[d]" about sexual encounters that she saw in an adult film.  *Id.* at 5.  Furthermore, defense counsel made several points about the common-sense conclusions that could be drawn from Aisha's interactions with Medlin.  In relevant part, he stated as follows:

> In addition, Aisha never expressed that she had any fear of George, which is not what one would normally expect, and the jury can use their common sense in evaluating the testimony in these matters.  One would not expect

that if an adult male of 209 pounds,[15] as she called it, put his privates in her privates and it hurt a lot, one would not expect that even if she was scared . . . to tell anybody, . . . one would think that she would not be eager to be in his presence alone, and would have told her mother when her mother wanted to leave her by herself with George[,] "Mommy, I don't want to stay with George."  She doesn't have to say why.  "I don't want to stay with George."

The little girl never said anything like that.  She never expressed to anyone that she didn't want to be near George and was uncomfortable in his presence which is not the usual way things work.

*Id.* at 6.  Defense counsel underscored that there could have been other "male friends" who may have had an opportunity to cause harm to Aisha.  *Id.* at 7.

In regard to the expert testimony, Medlin's attorney stated the following:

[J]ust because a witness is qualified and testifies as an expert witness, does not mean that the jury has to blindly accept her opinion on the issue that she's testifying to.  The jurors can analyze her reasoning for her opinion and use their own common sense in evaluating her reasons and deciding whether or not her opinion really holds water or not.

*Id.* at 8.  In other words, counsel argued to the jurors that they did not have to return a verdict consistent with the expert testimony if it did not comport with their common sense.

Defense counsel then raised a number of points regarding Medlin's personal history, family history, and character.  *Id.* at 10–12, 14 ("And as I mentioned to you a minute ago, if a 295 pound man actually put his privates in Aisha's privates, how in God's name would her hymen be intact, and how would there only be a tiny little, two millimeter tear and no scarring especially if it was done on more than one occasion?  [ . . . ]  It's just not possible, ladies and gentlemen.  I don't care what the expert says.").  He also underscored the possibility that Aisha was lying about the abuse due to jealousy over the relationship between Medlin and her mother, *id.* at 13, or pursuant to the direction of another adult, *id.* at 14.

---

[15] The record contains conflicting testimony regarding Medlin's weight and size in relation to Aisha. Specifically, at different times during his summation, defense counsel stated that he weighed 209 pounds, Doc. 33-4 at 6, and 295 pounds, *id.* at 14.  Regardless of Medlin's exact weight, his defense counsel repeatedly reiterated the difference in size between Medlin and Aisha.

He also criticized each of the expert's testimonies.  First, counsel called into question Dr. Shukat's conclusions.  *Id.* at 8.  He stated that "her opinion was based on two factors," namely, "[h]er conversation with Aisha on the 17th and on her medical examination of Aisha."  *Id.*  He then noted the following:

> Now, here's what I'm getting into with this common sense stuff. . . . [T]he doctor told you basically that because of the way the girl described the incident and because there was a tiny little two millimeter tear in the skin around her hymen, that she decided that this was a case of sexual abuse.
>
> [ . . . ]
>
> Now, remember, two millimeters, she said there was twenty-five millimeters to an inch.  So, two millimeters is just a little bit bigger than a sixteenth of an inch.
>
> Now, she said there could be some healing that would hide the damage so to speak over a period of time.
>
> Well, this is where you have to use your common sense.  Do you think a man, George's size, if he put his privates in her privates, would only have a tiny little two millimeter tear, her hymen would still be intact and there would be no evidence of any scarring from any past injuries?  To me that's pretty hard to believe using your common sense.

*Id.* at 8–9.

Counsel for Medlin then discussed Dr. Lewittes' testimony.  He noted that while Lewittes "testified basically about the syndrome, you know, that sometimes young victims of sexual abuse don't report the crimes right away for various reasons[,]" Lewittes "never examined Aisha."  *Id.* at 9.  Medlin's attorney further argued the following:

> He never looked at any of her medical records, never spoke to her, and so, basically, and he admitted to you, that he was not forming any opinion whether or not this was a case of sexual abuse or not, and he was just trying to give you information as to why sometimes children don't immediately report incidents of sexual abuse.

*Id.*

The state also discussed the testimony of each of the witnesses in its closing argument.  As relevant here, the prosecutor underscored the ways in which Medlin's testimony corroborated the allegations.  Specifically, the prosecutor stated the following:

George testified.  [ . . . ]  Think about what everybody said.  Where did
they agree?  Where don't they agree.  [ . . . ]  Everybody says, Aisha was
left with George, and the only people in the house were Aisha and George.
Everybody says, Aisha, she wasn't feeling well that day.  Aisha and
George told you she was eating soup, not one bowl, but two bowls.  What
do they differ on?  What is the one thing that's missing?  What is George
not telling you that day?  Think back again to the way she testified, how
she testified, what she testified to.  Did she sound like she was confused or
mistaken or didn't know what happened when her mother left her each
time with George or did she tell you exactly what happened?

*Id.* at 45–46.  The prosecutor argued that "[w]hen the defendant testified," his words were

"tailored to his needs."  *Id.* at 47.  The jury then began its deliberations.  *Id.* at 98.

The court thereafter received a note from the jury requesting the testimony of

Medlin, Aisha, and Cheryl.  *Id.* at 99–100.  The testimony was then read.  *Id.* at 100–105.

After additional deliberations, the jury indicated that they had been unable to

reach a verdict by the end of the afternoon.  *Id.* at 105.  The court noted specifically that

one juror could not "decide guilty or not guilty," and that the jurors had asked for

"guidance" from the court.  *Id.* at 106.  The judge therefore adjourned the case and

instructed the jury to return to the court the following Tuesday.  *Id.* at 107.

The following week, the judge began the proceedings by providing the jurors with

an *Allen* charge, with no objection from either party.[16]  *Id.* at 115.  The jury then

continued its deliberations.  *Id.*  The court thereafter received a note indicating that the

jury had reached a unanimous verdict.  *Id.* at 116.

The jury found Medlin guilty on all counts.  *Id.* at 118–120.  The jurors were

polled and each affirmed that this was their verdict.  *Id.* at 120–121.

### *vi.* Sentencing

Before proceeding to sentencing on February 5, 2005, defense counsel asked the

court to dismiss four counts on the basis of insufficient evidence.  Doc. 33-5 at 2.  The

---

[16] In delivering an *Allen* charge, a court typically instructs jurors to continue deliberating after reaching an
"apparent deadlock."  *United States v. Calderon*, 944 F.3d 72, 92 (2d Cir. 2019).  "A defining characteristic
of a so-called *Allen* charge is that 'it asks jurors to reexamine their own views and the views of others.'"
*Id.* (quoting *Spears v. Greiner*, 459 F.3d 200, 204 n.3 (2d Cir. 2006)).

court denied the application, noting that "there was sufficient evidence to sustain the verdicts on every count that was rendered by [the] jury." *Id.* at 3.  Thereafter, defense counsel submitted several arguments against the imposition of an increased sentence. *Id.* at 7.  Among other things, counsel emphasized Medlin's "minor" criminal record, *id.* at 8, in addition to his family and community support, *id.* at 9–10.  He also underscored his common-sense defense, stating that "if [Medlin] had done what this little girl had said . . ., there would have been much more extensive damage as indicated by the doctor's examination and there just wasn't, Judge." *Id.* at 12.  Accordingly, counsel requested a sentence to the "minimum amount of time." *Id.* at 13.

Medlin then made a statement.  He asserted that he felt he was wrongly convicted. *Id.* at 13.

The judge imposed a sentence of twenty-five years on each count, to run concurrently. *Id.* at 16–17.  He also imposed a five-year period of supervision following Medlin's release. *Id.* at 17.

**B.  State N.Y.C.P.L. § 440.10 Proceedings**

In July 2009, Medlin moved for an order vacating his judgment of conviction pursuant to N.Y.C.P.L. § 440.10.  Doc. 27 ¶ 8.  Medlin argued that his trial counsel had provided ineffective assistance by failing to call as a witness, or consult with, experts in the fields of medicine and child sexual abuse. *Id.*

The court held a hearing on the motion in December 2012, and it received testimony from Dr. Vincent Palusci, a witness for Medlin, Dr. Aaron Miller, a witness for the prosecution, and trial counsel. *Id.*

**i.  Testimony of Dr. Palusci**

Medlin's motion was primarily based on the testimony of Dr. Palusci, a medical expert that called into question the testimony of several trial witnesses.  Most critically, Dr. Palusci identified several deficiencies in Dr. Shukat's evaluation of Aisha as well as her subsequent testimony.

First, Palusci noted that "the interview of [Aisha and Cheryl] to obtain [Aisha's] medical history should have been performed in a forensically-sound manner," and further stated that the questions posed to Aisha should have been included in Dr. Shukat's report. Doc. 27-1 at 83 ¶¶ 5, 6. Palusci also affirmed that he would have testified that the "accepted protocol[] at the time of [Aisha's examination]," was to take photographs to document clinical findings of possible sexual abuse "when abnormal findings, such as the alleged two millimeter tear, were present." *Id.* at 84–85 ¶ 9.

Among other things, Dr. Palusci further noted that, had he been called to testify he would have told the jury that in conducting a genital exam, it "was important" to note the "width, configuration, depth" and "a more detailed description of the tear's color, and the presence of granulation or healing tissue." *Id.* at 86 ¶ 11. He also testified that "the complainant's injuries could also have been caused, to a reasonable degree of medical certainty, by infection, disease, or injury occurring after the application of topical ointments." *Id.* at 86 ¶ 12.

Critically, Palusci also testified as follows:

> Had I been called to testify, I would have stated that based upon the examination findings and my clinical experience, the perihymenal "tear," as located by Dr. Shukat in her report and trial testimony, is more consistent with having been caused by a sharp object or fingernail than penile-genital contact. I would also have testified that the force from a penis needed to cause the alleged two millimeter perihymenal "tear" would have caused other associated injuries to the genitalia, including bruising and tears to the posterior fourchette and labia, as well as tears, transections, and other damage to the hymen. This lack of these associated findings is inconsistent with the allegation by the complainant of penile-vaginal penetration.

*Id.* at 87 ¶ 13.

Palusci specifically stated that Aisha's injuries may have been caused by "irritation from inappropriate bubble bath or soap, and [at] some point in the record there is discussion of dishwasher detergent to be used to bathe the child;" "minor injury as someone was wiping the child;" eczema; lichen sclerosis; and other "alternative

explanations." Doc. 34 at 18–19.  Notably, he further stated that "we're talking about small sizes down here, and [a] penis going into this child's vagina or hymen opening would generally cause more trauma than we're seeing." *Id.* at 21.

Importantly, however, Palusci testified that in some cases, injuries "may not show up on the exam for several reasons," including the passage of time, the fact that "things may have healed," and that some abuse "is not damaging to the tissues."  Doc. 34-1 at 21. Palusci added that "I know it is hard to believe but sometimes things touch tissues down there and there is very little physical injury even though there has been contact internal to the labia majora/minora." *Id.*  In other words, Dr. Palusci asserted that the absence of injury could not confirm the absence of sexual abuse.  Ultimately, Dr. Palusci concluded that it was possible that Aisha's injury was caused by contact "with a penis in the vulva." Doc. 34 at 21.

### ii.   Testimony of Dr. Miller

The court also heard testimony from Dr. Aaron Miller to rebut the testimony of Dr. Palusci.[17]  Dr. Miller testified that there was nothing in Dr. Shukat's records that "did not comport with standard interviewing protocol or examination protocol."  Doc. 34-3 at 18. Nor did Dr. Miller see any issues with documentation of the history or physical observations from Aisha's examination.  *Id.* at 19.

In regard to the records of Aisha's injury, Dr. Miller stated the following:

> Well, when you are talking a small tear of two millimeters, I mean, that's really small.  You can imagine a wide range of things that could cause a small little tear like this.  If a child takes too many bubble baths and they get what we call vulvitis which is just a generic term meaning inflammation or redness.  If you have inflammation and redness of the vesicular area which is a very common complaint, all pediatricians have seen it, that would increase the susceptibility to causing a tear with less trauma or with less force being used.  I would say that's the most common scenario in a child of this age.
>
> As far as possible innocent explanations for how a child got a two millimeter tear next to her hymen, of course [they exist].  Other

---

[17] Miller succeeded Dr. Shukat as the director of the Lincoln Child Advocacy Center.  Doc. 34-3 at 3–4.

explanations include sexual abuse, you know if the perpetrator takes their hand and is trying to insert their penis into the child's genitalia. The perpetrator's fingernails could cause abrasions or other marks. There can be blunt force injury which can cause bruises or abrasions or lacerations or tears in the genitalia.

As far as other medical causes for a two millimeter tear, in theory it's possible to get a straddle injury that causes a tear in this area although most often in straddle injuries you see an injury to the outer area with the labium minora or the labium majora because when children jump or fall and they land on something on their genitalia their legs are usually open, you know, wide enough that their labia are exposed but not usually wide enough that their vestibule is the first thing that gets impacted by the object[.]

*Id.* at 28–30.

### iii. Dr. Shukat Statement

The prosecutor also submitted a statement by Dr. Shukat ahead of Medlin's § 440.10 hearing. Dr. Shukat said that, "were she to testify today, regarding the examination she conducted of Aisha [], and the findings she observed, she would not testify as to the aging of the injuries, and the age of the specific injuries she observed, as she did in her 2005 [trial] testimony." Doc. 7 at 55–56. That is, Dr. Shukat conveyed that she would not have estimated the date when Aisha was injured, as she did during Medlin's trial. *See* Doc. 33-3 at 35–36.

### iv. Trial Counsel Statement

Medlin's § 440.10 documents also included an affirmation from Medlin's trial counsel. Attorney Johnston indicated that, to his best memory, he did not consult with or have appointed an expert in the area of child sexual abuse. Doc. 27-1 at 93. He further stated that the "reason for that decision was that the alleged victim was not examined by the People's expert until about two weeks after the alleged last act of abuse and that there was no evidence of sexual penetration and that the hymen of the alleged victim was intact." *Id.* Accordingly, he concluded that "[u]nder those circumstances[,] . . . an expert appointed by the court on [Medlin's] behalf would have had little to dispute." *Id.* Johnston noted that it was his decision to allow the jury to use common sense to

18

determine "whether or not an adult male of normal size could have committed the alleged acts and not have affected the hymen." *Id.* at 93–94.

### v.   Trial Court Decision & Order

The court issued a decision and order as to Medlin's § 440.10 motion on December 12, 2012.  Doc. 27-5.  The court denied Medlin's ineffective assistance arguments, noting that the challenge amounted to simple disagreement with defense strategies and tactics.  *Id.* at 4 (citing *People v. Rivera*, 71 N.Y.2d 705, 708–109 (1988)).

Critically, the court distinguished Medlin's case from *Gersten v. Senkowski*, 426 F.3d 588, 607–609 (2d Cir. 2005), a contemporaneous case in which the Second Circuit concluded that a defense attorney had provided ineffective assistance by failing to call or consult with a medical expert on child sexual abuse in a case that had similar circumstances.[18]  *Id.*  The court emphasized that although "failure to 'consult with or call a medical expert is often indicative of ineffective assistance of counsel,' . . . this comes into play where there is a reliance *solely* on the credibility of the victim." *Id.* at 9 (quoting *Gersten*, 426 F.3d at 607) (emphasis in original).  The court then noted that in Medlin's case, "the evidence included physical evidence, the testimony of the child's mother, and the testimony of the victim," and further underscored that Medlin's new expert "in fact agreed with the People's expert." *Id.*  Accordingly, the court denied Medlin's motion to vacate his convictions.

### vi.   Appeal

Medlin appealed his conviction, sentence, and the trial court's denial of his § 440.10 motion to vacate the judgment of conviction.  *See Medlin*, 144 A.D.3d at 426. The Supreme Court Appellate Division, First Department unanimously affirmed.  *Id.*  In relevant part, it stated the following:

---

[18] Critically, the trial at issue in *Gersten* featured testimony from Dr. Lewittes.  *Gersten*, 426 F.3d at 600. The scientific validity of Lewittes' conclusions were called into question in that case.  *Id.* at 600–601.

> Defendant asserts that his trial counsel should have called, or at least consulted, two kinds of expert witnesses.  However, defendant has not shown that the alleged omissions fell below an objective standard of reasonableness, or that, viewed individually or collectively, they caused any prejudice under the state and federal standards.

*Id.* (quoting *People v. Benevento*, 91 N.Y.2d 708, 713–714 (1988); *Strickland v. Washington*, 466 U.S. 668 (1984)).  The Appellate Division emphasized that "although the conviction rested primarily on the testimony of the victim, who was six years old at the time of the crime, her testimony was highly credible."  It further noted that "the victim's credible testimony was consistent with the medical history used to formulate the diagnosis of sexual abuse," and it is "unlikely that the proffered medical expert testimony would have been helpful to the defense."  *Id.* at 427.

In regard to Johnston's strategy, the Appellate Division concluded the following:

> While it may have been reasonable to call a medical expert, the actual strategy adopted by the defense at trial—to appeal to the jury's common sense in arguing that a sexual assault by a grown man on a six-year-old girl would have resulted in significant trauma, and not merely a two-millimeter tear—was also objectively reasonable.  Moreover, this was part of a coherent and legitimate overall defense strategy.  In any event, defendant has not demonstrated a reasonable probability that calling a medical expert would have affected the outcome.

*Id.*  The court also noted that Medlin was "likewise not deprived of effective assistance by his trial counsel's failure to call an expert to attempt to discredit the People's expert psychologist's testimony on child sexual abuse syndrome."  *Id.*  It underscored that "[s]uch testimony is generally accepted by New York courts" when introduced for the purpose of explaining that "child sex abuse victims frequently delay disclosure of the abuse."  *Id.*

Finally, in regard to *Gersten*, the Appellate Division noted that "[r]egardless of whether the particular record in [that case] may have indicated that a defense expert could have discredited the People's expert . . ., here defendant made no showing that [Lewittes]' limited testimony would have been readily rebuttable."  *Id.*

20

Medlin sought leave to appeal the Appellate Division's decision; however, the New York Court of Appeals denied his application.  *People v. Medlin*, 29 N.Y.3d 999 (2017) (denying application on April 6, 2017).

### C.  The Instant 28 U.S.C. § 2254 Petition

Medlin filed the *habeas corpus* petition now before the Court on June 29, 2018. Doc. 1.  He raised two grounds for relief, each of which he previously brought in state court:  (1) he was denied his Sixth Amendment right to the effective assistance of counsel due to his trial attorney's failure to call or consult with a medical expert at trial, Doc. 7 at 108–139; and (2) he was denied his Sixth Amendment right to effective assistance of counsel due to his attorney's failure to rebut the trial testimony of Dr. Lewittes pertaining to Child Sexual Abuse Syndrome, *id.* at 140–151.

After several extensions of time, the state filed a response in opposition on March 5, 2021.  Doc. 25.  Medlin filed a reply on October 27, 2021.  Doc. 37.

Judge Aaron then issued the Report on January 18, 2022.  Doc. 42.  The Report concluded that the Appellate Division's decision was a reasonable application of *Strickland*, specifically insofar as it held that Medlin failed to show that he was prejudiced by his counsel's performance.  Doc. 42 at 22.  The Report underscored that there was no reasonable probability that the outcome of Medlin's trial would have been different had Johnston called or consulted with experts to rebut the testimonies of Shukat and Lewittes.  *Id.* at 25.

Thereafter, Medlin filed his objections to the Report on February 10, 2022.  Doc. 46.  The respondent opposed the objections on April 27, 2022.  Doc. 49.

## II.  STANDARD OF REVIEW

### A.  Review of the Magistrate Judge's Report

A district court reviewing a magistrate judge's Report and Recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Parties may raise "written" objections to

the report and recommendation "[w]ithin fourteen days after being served with a copy." *Id.*; Fed. R. Civ. P. 72(b)(2).  A district court reviews *de novo* those portions of the Report and Recommendation to which timely and specific objections are made.  28 U.S.C. § 636(b)(1)(C); *see also United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38 (2d Cir. 1997).

The district court may adopt those parts of the Report to which no party has timely objected, provided no clear error is apparent from the face of the record.  *Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008) (citations omitted).  The district court will also review the Report for clear error where a party's objections are "merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition." *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) (citations and internal quotation marks omitted); *see also Genao v. United States*, No. 08 Civ. 9313 (RO), 2011 WL 924202, at *1 (S.D.N.Y. Mar. 16, 2011) ("In the event a party's objections are conclusory or general, or simply reiterate original arguments, the district court reviews the [R&R] for clear error.").

### B.  AEDPA Review of the State Court Proceedings

Because Medlin's ineffectiveness claims were considered and rejected by the state court pursuant to § 440.10, this case is subject to the deferential standard of review of state court adjudications under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d).

Under AEDPA, *habeas corpus* petitions filed under 28 U.S.C. § 2254 may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (d)(2). This deference is required under the AEDPA if the petitioner's claim "was adjudicated on

the merits in State court proceedings."  28 U.S.C. § 2254(d); *see Bell v. Miller*, 500 F.3d 149, 154–55 (2d Cir. 2007).

"Th[e] statutory phrase ['clearly established Federal law, as determined by the Supreme Court of the United States,'] refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 365 (2000).  In order for a federal court to find that the state court's application of Supreme Court precedent was unreasonable, the decision must be objectively unreasonable rather than simply incorrect or erroneous.  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The factual findings made by state courts are presumed to be correct under the AEDPA, and petitioner has the burden to rebut this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Nelson v. Walker*, 121 F.3d 828, 833 n.4 (2d Cir. 1997).

Where a petitioner challenges his convictions on the basis of ineffective assistance of counsel, the question is whether the state court unreasonably applied *Strickland*.  *Williams*, 529 U.S. at 390.

## III.   MEDLIN'S OBJECTIONS

Medlin objects to the conclusions set out in Judge Aaron's Report.  *See generally* Doc. 46.  Specifically, he contends that the R&R erroneously concluded that he was not prejudiced by his trial counsel's failure to call experts to challenge the state's testimony from Dr. Shukat and Dr. Lewittes.[19]  *Id.*  For the reasons stated below, the Court adopts each of the recommendations set out in the Report and denies Medlin's motion in its entirety.

---

[19] Medlin's objections also noted that the Report did not decide whether the Appellate Division's ruling as to the first prong of the *Strickland* test, whether defense counsel's representation fell below an objective standard of reasonableness.  Doc. 46 at 5; *see also Strickland*, 466 U.S. at 688.

### A. *Strickland* Standard

"A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which include entry of a plea of guilty, and sentencing." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (internal citations omitted). To succeed on a claim of ineffective assistance of counsel, a claimant must satisfy the two-part test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984):

> "Under *Strickland*, in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test: (1) he 'must show that counsel's performance was deficient,' so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance,' and (2) he must show 'that the deficient performance prejudiced the defense,' in the sense that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"

*Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 687, 690, 694); *see also Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

Under the first prong of *Strickland*, the Court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. The Court "must make 'every effort to eliminate the distorting effects of hindsight,' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Bell*, 500 F.3d at 156 (quoting *Strickland*, 466 U.S. at 689). The convicted defendant is required to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and the court "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Critically, strategic choices made by counsel after a thorough investigation are "virtually unchallengeable,"

and "there is a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance."  *Gersten*, 426 F.3d at 607 (internal quotation marks and citations omitted).

Under the second prong of *Strickland*, the petitioner must establish prejudice. "To establish prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *Kovacs v. United States*, 744 F.3d 44, 51 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).  To satisfy reasonable probability, "the defendant must show more than that the unprofessional performance merely had some conceivable effect . . . [;] however, a defendant *need not show* that counsel's deficient conduct *more likely than not* altered the outcome in the case."  *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks and citations omitted) (emphasis in original).

The Second Circuit has noted that "[i]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel."  *Gersten*, 426 F.3d at 607 (citing *Eze v. Senkowski*, 321 F.3d 110, 127–128 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001)).  "This is particularly so where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony."  *Id.* (citation omitted). However, the Second Circuit has also made clear that there is no *per se* rule requiring trial counsel to consult with or call experts in child sex abuse cases.  *Gersten*, 426 F.3d at 609.

### B.   Neither the Trial Court Nor the Appellate Division Unreasonably Applied *Strickland*

The state courts did not unreasonably conclude that Medlin's trial counsel provided effective assistance of counsel, despite his failure to consult with or call to testify experts to rebut the testimonies of Dr. Shukat and Dr. Lewittes.  28 U.S.C. § 2254(d).  The record makes clear that attorney Johnston's decisions in this regard were neither constitutionally deficient nor prejudicial under *Strickland*.  *See Bennett*, 663 F.3d at 84.

### i.   Medlin's Trial Counsel's Performance Fell Within the Wide Range of Reasonable Professional Assistance

Medlin's trial counsel performed reasonably under the circumstances of his criminal case.  *See Bell*, 500 F.3d at 156; *Strickland*, 466 U.S. at 689.  First, defense counsel developed a theory that he pursued consistently throughout Medlin's trial:  he argued that Medlin had neither the means nor the opportunity to engage in the alleged conduct, and a common-sense evaluation of the evidence showed that Medlin could not have engaged in the acts described by Aisha.  *See, e.g.*, Doc. 33-1 at 33; Doc. 33-4 at 6.

Additionally, counsel thoroughly cross-examined each of the state's witnesses, therein advancing those defense theories.  For example, in his cross-examination of Aisha, counsel explored whether Cheryl had "other boyfriends that visited the apartment," or, generally, "other men."  Doc. 33-2 at 61, 72.  He also elicited testimony showing that there were times during which Aisha could have told her mother about the alleged abuse, but did not do so.  *Id.* at 66.  Counsel asked Cheryl similar questions, thereby seeking to further the theory that any number of people other than Medlin could have committed the alleged crimes.  *Id.* at 134–135.

Critically, Johnston also thoroughly and ably cross-examined the state's expert witnesses, seeking to advance the defense theories through his examinations.  For instance, during his cross-examination of Dr. Shukat, counsel asked about the possible inconsistencies between Aisha's allegations and the absence of any scar tissue on her

person.  Doc. 33-3 at 25.  He also specifically questioned Dr. Shukat about the expected
injuries in the case of "sexual penetration" performed by a "heavyset" man like Mr.
Medlin, going on to emphasize that all that was found during Aisha's genital examination
was "a two millimeter tear."  *Id.* at 26.  Johnston then confirmed that Shukat had found
"no injury to the hymen at all," nor "any bleeding," thereby continuing to press the jury
toward his common-sense defense.  *Id.*

The same thorough approach took place during Dr. Lewittes' testimony.  *See
generally* Doc. 33-2 at 78–111.  Johnston highlighted that Lewittes had never spoken to
Aisha or reviewed "any medical records or psychiatric reports concerning her treatment."
*Id.* at 103.  He then went on to confirm that Lewittes had "no opinion in this particular
case as to whether or not Aisha [] was sexually abused or not."  *Id.*  This point is critical.
Indeed, it highlighted for the jury that Lewittes' testimony pertained to general theories
and bodies of research about Child Sexual Abuse Syndrome, not about the alleged abuse
presented by the prosecution during Medlin's trial.  Defense counsel then went on to
elicit testimony about cases wherein allegations of sexual abuse are "prove[n] to be
false."  *Id.*

Johnston then called multiple witnesses and elicited testimony about Medlin's
character and absence of opportunity to commit the alleged crimes.  *See generally* Doc.
33-3 at 41–159.

Taken together, these efforts show that Johnston's judgment to proceed with his
defenses—and to not call expert witnesses to rebut the testimony of Shukat and
Lewittes—fell within the wide range of reasonable assistance.  As the state points out,
each of these aspects of Johnston's performance distinguishes his assistance from other
cases wherein courts have granted Sixth Amendment claims like Medlin's.

For example, in *Gersten*, 426 F.3d at 607–608, the Second Circuit determined that
defense counsel provided ineffective assistance where counsel failed to "call as a witness,
or even consult in preparation for trial and cross-examination of the prosecution's

witnesses, any medical expert on child sexual abuse."  Critically, however, in *Gersten*,
"[c]ounsel essentially conceded that the physical evidence was indicative of sexual
penetration without conducting any investigation to determine whether this was the case."
*Id.* at 608.  That conduct stands in stark contrast to defense counsel's performance in
Medlin's case, where Johnston repeatedly and continuously called into question any
evidence suggesting that there had been sexual penetration.

Additionally, in *Gersten*, "[t]he prosecution's case rested centrally on the alleged
victim's testimony and its corroboration by the indirect physical evidence as interpreted
by the medical expert."  *Id.*  Accordingly, "[t]he medical expert testimony was central not
only because it constituted the most extensive corroboration that any crime occurred, but
because to undermine it would undermine the alleged victim's credibility and thus the
entire prosecution case as to all charges."  *Id.*  Medlin contends that the same was true
here; he states that "the only corroborating evidence in this case was provided by the
People's two medical experts."  Doc. 7 at 11.  However, that assertion is clearly belied by
the record.  Indeed, as the state notes, both Cheryl and Medlin "corroborated details
concerning the circumstances surrounding the incidents, underscoring Aisha's
exceptional memory of the incidents and the accuracy of her testimony."  Doc. 26 at 18.
Among other things, it was Medlin who corroborated Aisha's testimony that he babysat
her on several occasions during the winter of 2003 and 2004; that Aisha was sick on one
occasion, asked Medlin to make her soup, and ate two bowls over the course of his time
watching her.  *See* Doc. 33-3 at 108–127.  It was also Medlin who corroborated that
Aisha's mother told her to stay home with Medlin on one occasion because it was cold
outside.  *Id.* at 126.

The Court cannot thus conclude that defense counsel's performance in Medlin's
case suffered from the deficiencies outlined by the Second Circuit in *Gersten*.  Critically,
the *Gersten* court made clear that there is no *per se* rule that requires trial attorneys to

seek out experts in sexual abuse cases like Medlin's, particularly where defense counsel uses other approaches to call into question medical evidence.  *See Gersten*, 426 F.3d at 609 ("Here, no facts known to defense counsel at the time that he adopted a trial strategy that involved conceding the medical evidence could justify that concession.").

To be sure, it may have been reasonable for Johnston to have consulted with and called rebuttal experts in his defense of Medlin.  However, because the caselaw did not, and does not, require counsel to do so, and because Johnston otherwise performed ably in his defense of Medlin, the Court cannot conclude on this record that Johnston's assistance fell below the wide range of reasonable professional assistance.  *See Bell*, 500 F.3d at 156; *Strickland*, 466 U.S. at 689.

Accordingly, neither the state trial court nor the Appellate Division unreasonably applied the first prong of the *Strickland* standard.  The Appellate Division appropriately concluded that "the actual strategy adopted by the defense at trial—to appeal to the jury's common sense in arguing that a sexual assault by a grown man on a six-year-old girl would have resulted in significant trauma, and not merely a two-millimeter tear—was [] objectively reasonable," noting also that this "was part of a coherent and legitimate overall defense strategy."  *Medlin*, 144 A.D.3d at 427.  Medlin's § 2254 petition is thus properly dismissed on the basis that his defense counsel provided reasonable professional assistance in his criminal prosecution.

### *ii.*   **Medlin Was Not Prejudiced by His Trial Counsel's Performance**

Additionally, reviewing the record *de novo*, the Court agrees with Judge Aaron's conclusion that the Appellate Division properly concluded that Medlin was not legally prejudiced by Johnston's performance, as that term is defined by *Strickland* and its progeny.  Doc. 42 at 22–30; *Strickland*, 466 U.S. at 691–692 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.  [ . . . ]  The purpose of the Sixth

Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding.") (citation omitted).

As relevant here, the Appellate Division concluded that Medlin had not "shown that the alleged omissions [by Johnston] . . . viewed individually or collectively, [] caused any prejudice under the state and federal standards." *Medlin*, 144 A.D.3d at 426.  It further noted that "Defendant was not deprived of effective assistance by his attorney's decision not to call a medical expert to testify on alternative causes of the two-millimeter tear in the victim's perihymenal area," underscoring that the medical expert that Medlin relied on in support of his § 440.10 motion, Dr. Palusci, "agreed with the People's expert" in various respects, including insofar as Shukat concluded that physical findings must be taken together with medical history.  *Id.*  The court emphasized that, in Medlin's case, "the victim's credible testimony was consistent with the medical history used to formulate the diagnosis of sexual abuse."  *Id.* at 427.  Accordingly, under the circumstances, "it is unlikely that the proffered medical expert testimony would have been helpful to the defense."  *Id.*

The Court adopts the Report's conclusion that the Appellate Division's finding in this regard was reasonable.  As Judge Aaron pointed out, "there was little support in the victim's medical history for other potential causes of the tear."  Doc. 42 at 23–24 (citation omitted).  Accordingly, to the extent that Dr. Palusci listed other possible causes for Aisha's injuries, those possibilities did not so undermine Dr. Shukat's testimony that, "if this testimony was presented to the jury, Petitioner would have been acquitted."[20]  *Id.* at 23 (citation omitted).  Indeed, although Dr. Palusci's testimony critiqued the manner in

---

[20] Indeed, Dr. Palusci testified that in some cases, injuries "may not show up on the exam for several reasons," including the passage of time, the fact that "things may have healed," and that some abuse "is not damaging to the tissues."  Doc. 34-1 at 21.  Palusci added that "I know it is hard to believe but sometimes things touch tissues down there and there is very little physical injury even though there has been contact internal to the labia majora/minora."  *Id.*  In other words, Palusci's testimony supported Shukat's diagnosis, despite the absence of more meaningful injuries.  Given this record, the Court cannot conclude that Medlin would have been acquitted had Palusci's testimony been presented to the jury.

which Dr. Shukat conducted her examination, Palusci affirmed that it was possible that Aisha's injuries were caused by the alleged abuse.[21]  Doc. 27-1 ¶¶ 5–13; Doc. 34 at 18–21.  And as already articulated above, the credibility of Aisha's testimony was further bolstered on several other occasions during the trial, including by Medlin's testimony.  Critically, in order for a federal court to find that the state court's application of Supreme Court precedent was unreasonable, the decision must be objectively unreasonable rather than simply incorrect or erroneous.  *Lockyer*, 538 U.S. at 75.  Medlin simply cannot make that showing on this record.

In regard to Johnston's failure to consult or call an expert to rebut the testimony of Dr. Lewittes, the Appellate Division concluded that Medlin "was likewise not deprived of effective assistance," given that "[t]he People's expert simply explained that child sex abuse victims frequently delay disclosure of the abuse."  *Medlin*, 144 A.D.3d at 427.  It noted that "such testimony is generally accepted by New York courts when introduced for that purpose."  *Id.*  Furthermore, in regard to the Second Circuit's opinion in *Gersten*, the Appellate Division concluded the following:

> Regardless of whether the particular record in [*Gersten*] may have indicated that a defense expert could have discredited the People's expert in that case, here defendant made no showing that the psychologist's limited testimony would have been rebuttable.  In the CPL 440.10 proceeding, defendant did not present an affidavit or testimony from any psychologist.  In any event, regardless of whether trial counsel should have called such an expert, defendant has likewise failed to demonstrate a reasonable probability that calling the expert would have affected the outcome.

*Id.*

The Court also agrees with the Report's conclusion that Medlin was not prejudiced by defense counsel's decision not to call or consult with an expert that may

---

[21] Additionally, as the state notes, "[i]n weighing the potential impact of Dr. Palusci's testimony at trial, it must be remembered that, had he testified for [the] defense, the prosecution would have been entitled to present rebuttal testimony, including testimony by another medical expert, such as Dr. Miller."  Doc. 26 at 31.  Critically, during the § 440.10 proceeding, Dr. Miller confirmed the soundness of Dr. Shukat's methodology and conclusions.  *See* Doc. 34-3 at 3–30.

have been able to discredit Dr. Lewittes' testimony.  Doc. 42 at 26–29.  As Judge Aaron noted, "[i]t is undisputed that Petitioner failed to proffer expert testimony at the § 440.10 hearing or before this Court rebutting Dr. Lewittes' testimony."  *Id.* at 27.  Considering that context, the Court cannot conclude that it was unreasonable for the Appellate Division to conclude that Medlin failed to demonstrate that calling such an expert would have affected the outcome of his case.  This is particularly true in light of trial counsel's cross-examination of Dr. Lewittes, and specifically, his efforts to elicit testimony distancing Lewittes' academic discussion from Medlin's case.  *See* Doc. 33-2 at 103.

Additionally, as the Report also underscores, while the Second Circuit discredited the validity of testimony regarding Child Sexual Abuse Syndrome in *Gersten*, 426 F.3d at 611, the New York Court of Appeals subsequently rejected a challenge to the scientific validity of the same type of testimony, *People v. Spicola*, 16 N.Y.3d 441, 466–467 (2011); *see also People v. Lathrop*, 171 A.D.3d 1473 (4th Dep't 2019) ("It is well settled that expert testimony concerning [the syndrome] 'is admissible to explain the behavior of child sex abuse victims as long as it is general in nature and does not constitute an opinion that a particular alleged victim is credible or that the charged crimes in fact occurred.'") (citing *People v. Drake*, 138 A.D.3d 1396, 1398 (4th Dep't 2016)) (additional citations omitted).  Accordingly, "in these circumstances, it was incumbent on Petitioner to put forth an affidavit or testimony from a psychological expert stating how that expert would rebut Dr. Lewittes's testimony . . . in his case."  Doc. 42 at 28–29.  Because Medlin failed to do so, the Appellate Division did not unreasonably apply the prejudice prong of the *Strickland* standard.  *Medlin*, 144 A.D.3d at 427.

The Court thus adopts Judge Aaron's recommendation regarding defense counsel's failure to call an expert to rebut Dr. Lewittes' testimony.

## IV.    CONCLUSION

For the reasons set forth above, the Court adopts Magistrate Judge Aaron's Report in its entirety and Medlin's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 is DENIED.  The Clerk of Court is respectfully directed to close this case.  As Medlin has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c); *see also, e.g.*, *Matthews v. United States*, 682 F.3d 180, 185 (2d Cir. 2012).

It is SO ORDERED.

Dated:    April 25, 2023
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.